**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **MARANDA MOREFIELD, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br>**v.**<br><br>**KETTERING ADVENTIST HEALTHCARE, D/B/A KETTERING HEALTH**<br><br>**Defendant.** | : | **Case No. 3:26-cv-00212**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Maranda Morefield ("Plaintiff or "Morefield") brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against Kettering Adventist Healthcare d/b/a Kettering Health ("Kettering" or "Defendant") and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Information about a person's physical and mental health is among the most confidential and sensitive information in our society. The mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE

2. Simply put, if people do not trust that their sensitive, private information will be kept private, they are less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and ensuring it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3. Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code that can connect the individual to the collecting entity.

4. As detailed below, Defendant's illegal and widespread practice of disclosing Plaintiff's and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI" and, collectively with PII, "Private Information") to third parties, including, but not necessarily limited to Google, LLC ("Google") and StackAdapt, Inc. ("StackAdapt") is an ongoing harm to its users and the healthcare system as a whole.

**<u>Kettering Collects Vast Troves of Private Information</u>**

5. Kettering controls and maintains a website, *https://ketteringhealth.org* (the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes and more.

6. Plaintiff and members of the putative class ("Class Members" and, with Plaintiff, "Users" and, each, a "User") who visited and used Defendant's Website understandably thought they were communicating *only* with their trusted healthcare providers.

7. Unbeknownst to Plaintiff and the Class Members, however, Kettering embedded

---

MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

various third-parties' tracking technologies on its Website, including but not limited to, Google DoubleClick, Google Analytics, and the StackAdapt Pixel (collectively, "Tracking Tools"). The Tracking Tools automatically transmit to third parties every click, keystroke and detail about Users' medical treatment.

8. Operating as designed and as implemented by Kettering, the Tracking Tools cause the Private Information that Plaintiff and Class Members provide to Kettering to be unlawfully disclosed to third parties, like Google.

9. The Private Information Kettering sends to third parties is also linked to Users' unique IP address or other identifiable user profiles created by the Tracking Tools, which allow the Users to be personally identifiable to the third parties.

10. Tracking Tools are snippets of code embedded on a website (or other digital platform) that surveil and record a User's identity and activity, such as how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

11. The User's web browser executes the Tracking Tool via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. Tracking Tools are customizable and programmable, meaning that the website owner controls which of its web pages contain the Tracking Tools and which events are tracked and transmitted to third parties.

12. By installing Tracking Tools, Kettering effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive, and confidential health-related communications with Kettering to third parties.

13. Defendant utilized Tracking Tools for marketing purposes to bolster its profits; that is, despite its duty to maintain the privacy of its Users' Private Information, Kettering prioritized its own desire for profit over the privacy rights of its patients.

14. Tracking Tools are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Third parties use Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Kettering.

15. The information that Kettering's Tracking Tools sent to third parties included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, patient status, medical conditions searched by Users', names of providers whose profile pages were viewed by the Users, when Users click to sign in to the patient portal, when Users click to pay a bill, facility locations selected or searched by Users, User's free-text searches made via the search bar, when Users click to call their provider, Users' appointment scheduling and every page URL the User visited on the website. This information was transmitted to third parties alongside Users' personal identifiers, including IP addresses and unique cookie identifiers associated with Google and other third-party tracking technologies.

16. The information described in the preceding paragraph allows a third party (*e.g.*, Google) to learn and record that a specific patient sought confidential medical care. Third parties, in turn, sell Plaintiff's and Class Members' Private Information to fourth-party marketers who geo-target Users based on communications obtained via the Tracking Tools.

17. Google and third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data sent by Kettering's Tracking Tools that a

specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

**<u>Kettering's Disclosure of Users' Private Information</u>**
**<u>Without Consent Violates the Law</u>**

18. Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information to an undisclosed third party without the patients' informed and express consent.

19. Neither Plaintiff nor any other Class Members were provided, much less signed, a written authorization permitting Kettering to disclose their Private Information to third parties.

20. Despite willfully and intentionally incorporating the Tracking Tools into its Website and servers, Kettering never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties.[2]

21. Kettering's overall intent and purpose in acquiring Users' Private Information was to increase its ability to market and retarget its Users, thereby increasing its profit while violating federal statutes and other laws.

22. Plaintiff and the Class Members were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with their healthcare providers via Kettering's Website or that their information was stored on Kettering's servers to be later transmitted to third parties so it could be used for targeted advertising and marketing purposes.

---

[2] In contrast to Defendant, several medical providers have notified their patients of the fact that similar tracking technologies disclosed Private Information to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022)https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/.

23. As detailed below, Kettering owed statutory, regulatory, and contractual duties to keep Plaintiff's and Class Members' communications and medical information safe, secure and confidential.

24. The disclosure of Plaintiff's and Class Members' Private Information via the Tracking Tools contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Pursuant to HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which governs how health care providers must safeguard and protect Private Information.

25. Pursuant to the Privacy Rule, covered entities such as Kettering are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent from each patient.

26. Lest there be any doubt of the illegal nature of Kettering's practice, the Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates the Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[3]

27. The HHS Bulletin does not change any existing rule or impose any new obligation

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 12, 2026) (emphasis added).

on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

28. In contrast to Kettering, several medical providers that used Tracking Tools in a similar way have provided their patients with notice that their Private Information was transmitted to third parties.[4]

29. Kettering, moreover, made express promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

30. Kettering breached its statutory, regulatory and contractual obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google and other third parties; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools; (v) failing to warn Plaintiff and Class Members of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality, security and integrity of patient Private Information.

[4] *See supra* n.2.

31. As a result, Plaintiff and Class Members suffered injury and are entitled to relief, including statutory damages, any profits made by Kettering as a result of the violations, restitution and disgorgement of benefits Kettering unjustly obtained, and injunctive relief to prevent continued unauthorized disclosures of their Private Information.

32. Plaintiff therefore seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert statutory claims against Kettering for: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and (ii) unjust enrichment.

## PARTIES

33. Plaintiff Maranda Morefield is a natural person and a citizen of the State of Ohio. Ms. Morefield has been a patient of Kettering since at least 2017 and has maintained a Google account since at least 2022. During the relevant time period, Ms. Morefield has used the Kettering Website to request information on specific medical services, call/contact research providers and locations, and login to the MyChart patient portal. By doing so, Ms. Morefield's individually identifiable health information was disclosed to third parties under the systematic process described above. Ms. Morefield had no knowledge her sensitive medical information was shared with Google or other third parties and gave no consent or authorization for Kettering to use her individually identifiable health information.

34. Kettering Adventist Healthcare, D/B/A Kettering Health ("Kettering" or "Defendant") is a nonprofit healthcare system headquartered in Kettering, Ohio, Montgomery County, serving patients throughout the Ohio region. Kettering encompasses 14 facilities, including inpatient and outpatient care centers providing a wide range of services including behavioral health, cancer treatment, trauma and emergency care, and other advanced medical

services.

35. Kettering is a covered entity under HIPAA.

## JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged form part of the same case or controversy.

37. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

38. This Court has personal jurisdiction over Kettering because it operates and maintains its principal place of business in this District. Further, Kettering is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its Website in this District, including decisions regarding the privacy of Users' Private Information and the incorporation of Tracking Tools.

39. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in, and is subject to, personal jurisdiction in this District. Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in, and emanated from, this District.

## COMMON FACTUAL ALLEGATIONS

### A. Background: The Use of Tracking Technologies in the Healthcare Industry.

40. Tracking Tools installed on many hospitals', telehealth companies' and other healthcare providers' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among many other things—and sending that information to third-party vendors without prior, informed consent.

41. These Tracking Tools are snippets of code that track users as they navigate through a website, logging which pages they visit, which buttons they click, and additional information they enter into forms. In exchange for installing the Tracking Tools, the third-party platforms (*e.g.,* Facebook and Google) provide website owners with analytics about the advertisements they have placed as well as tools to target people who have visited their websites.

42. While the information captured and disclosed without permission may vary depending on the Tracking Tools embedded, these "data packets" can be extensive, sending, for example, not just the name of the physician and her field of medicine, but also the first name, last name, email address, phone number, zip code and city of residence entered into a booking form.

43. The data set forth in the preceding paragraph is linked to a specific internet protocol ("IP") address and several forms of unique identifier cookies. These cookies enable third-party vendors like Google to create a comprehensive user profile by connecting web activity to an existing account or, even if the User is not signed into such accounts, to another unique user profile.

44. IP addresses and cookie identifiers are considered PHI when connected to treatment records or other protected information under HIPAA.[5]

45. Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth

[5] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

companies' digital properties to surreptitiously capture and to disclose their Users' personal health information.

46. Specifically, and for example, *The Markup* reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Meta a packet of data whenever a person clicked a button to schedule a doctor's appointment.[6]

**B. Kettering Installed and Utilized Tracking Technology for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Third Parties.**

47. Kettering purposely installed Tracking Tools, including but not limited to Google Analytics, Google DoubleClick and the StackAdapt Pixel, on its Website and programmed the Website to surreptitiously share its patients' private electronic communications and Private Information with third parties.

48. On numerous occasions, with the most recent in March 2026, Plaintiff Maranda Morefield accessed Kettering's Website on her computer and used the Website to call her medical providers, request information on specific medical services, and research providers, review financial assistance resources, schedule appointments and login to MyChart.

49. Kettering assisted third party vendors with intercepting Morefield's communications, including those containing Private Information.

50. Kettering assisted these interceptions without Morefield's knowledge, consent or express written authorization. By failing to receive the requisite consent, Kettering breached its duties of confidentiality and unlawfully disclosed Morefield's Private Information.

51. Plaintiff's and Class Members' private information would not have been disclosed to Google, Microsoft, or other third parties through the Tracking Tools but for Kettering's decision to install, configure, and implement those tools on the Website.

[6] *See supra* n.1.

52. The following sections describe the specific Tracking Tools Kettering installed on its Website, how those tools operate, and how AmeriSave used them to intercept, duplicate, and disclose Plaintiff's and Class Members' Private Information to third parties.

**C. Google's Tracking Tools, Including Google DoubleClick and Google Analytics.**

53. By many measures, Google is one of the world's largest data and advertising companies. Among other services, Google operates Google Search, Gmail, YouTube, Google Maps, Google Analytics, Google Ads, and Google DoubleClick.

54. Google Analytics is an analytics service that allows website operators to measure website traffic, user behavior, and engagement across websites and digital platforms. Google DoubleClick is an advertising technology that tracks users across the internet using cookies, identifiers, and user communications to measure advertising performance, build audiences, and deliver targeted advertisements.

55. AmeriSave installed and utilized Google Analytics and Google DoubleClick (together, "Google Tracking Tools"), on its Website. By doing so, AmeriSave caused Plaintiff's and Class Members' browsers to communicate with Google while they were communicating with AmeriSave through the Website.

56. Google's advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with other advertising technologies and that server logs include identifiers that distinguish and, when a user is signed in, may uniquely identify a user. Google states that, in the context of advertising, "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely

identify your browser or, if you are signed-in, that may uniquely identify you."[7]

57. Google's tracking ecosystem uses cookies that are personally identifying to Google. Google explains that "cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time."[8]

58. Google also uses advertising cookies to target and deliver ads, including across non-Google sites. Google states: "The 'IDE' cookie is used to show Google ads on non-Google sites," and that "The 'NID' cookie can be used to show ads in Google services for signed-out users." In addition, Google explains that "the 'DSID' cookie is used to identify a signed-in user on non-Google sites," confirming that Google can recognize a logged-in user even while that user browses a third-party website.[9]

59. Further, independent cookie registers identify Google's __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC cookies as Google cookies used for targeting purposes, including building a profile of a website visitor's interests to deliver relevant or personalized Google advertising through retargeting.[10]

60. The cookies and identifiers used by Kettering's Website that enable Google DoubleClick, Google Analytics, and related Google Tracking Tools to acquire and record user communications and user-identifying information include, among others, the cookies named IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC. Each functions as a persistent personal identifier when received by Google and is used by Google's advertising

---

[7] Google, Advertising & Measurement Technologies, *https://policies.google.com/technologies/ads* (last visited May. 27, 2026).
[8] Google, How Google Uses Cookies & Similar Technologies, *https://policies.google.com/technologies/cookies?hl=en-US* (last visited June 23, 2026).

[9] *Id.*

[10] People's Partnership, Cookie Policy, https://peoplespartnership.co.uk/cookie-policy/ (last visited June 23, 2026).

and analytics systems to associate user activity, including the Website communications transmitted to AmeriSave, with Google's existing user and device profiles.

61. AmeriSave installed Google's Tracking Tools, including Google Analytics and Google DoubleClick, as well as other tracking technologies, on many, if not all, of the webpages within its Website and programmed or permitted those webpages to surreptitiously share users' Sensitive Financial Information and user-identifying information with Google.

62. While Plaintiff and Class Members navigated AmeriSave's Website, the Website provided Google with their IP addresses, device identifiers, browser information, cookie identifiers, page URLs, referral information, and information reflecting their interactions with AmeriSave's Website, including the pages they viewed, buttons and links they clicked, forms they accessed, information they entered or submitted, and the date and time of those communications. This is precisely the type of identifying information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients.[11]

63. Plaintiff's and Class Members' communications and user-identifying information would not have been disclosed to Google via the Google Tracking Tools but for AmeriSave's decision to install and implement those tools on its Website.

**D. StackAdapt Tracking Tools, including the StackAdapt Pixel.**

64. StackAdapt is a programmatic advertising company that operates a demand-side platform (DSP) used by marketers to buy digital ad inventory across websites, mobile apps, and connected TV through real-time bidding auctions. The company describes its DSP as infrastructure for brand and performance marketing and states that it processes billions of ad requests every

[11] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited May 12, 2026).

day. Through this system, StackAdapt helps advertisers reach users based on inferred interests, browsing patterns, and audience segmentation models.[12]

65. StackAdapt also provides marketers with the StackAdapt Pixel, a JavaScript tracking tag placed on advertisers' websites. According to StackAdapt's product materials for the Pixel in its industry solutions documentation, the Pixel collects information about on-site behavior such as page views, referrers, user actions, conversions, and custom events. This information is used to build audiences, measure performance, and attribute advertising results to specific users.[13]

66. When the Pixel loads, it communicates with tags.srv.stackadapt.com, which sets a persistent tracking identifier known as the sa-user-id. Third-party documentation confirms that the sa-user-id cookie, including variants like sa-user-id-v2 and sa-user-id-v3, is used to record details about a visitor's activity, such as the pages they viewed and the locations they accessed.[14]

67. Kettering installed and utilized the StackAdapt Tracking Tools, including the StackAdapt Pixel on its Website and programmed those technologies to operate in a manner that caused Plaintiff's and class members' communications, activity and identities to be transmitted to StackAdapt and other third parties in connection with StackAdapt advertising and analytics services.

### E. Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Tools

68. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client

---

[12] StackAdapt, *StackAdapt*, https://www.stackadapt.com (last visited June 23, 2026); StackAdapt Tech Blog, *In-App Advertising and SKAdNetwork*, https://stackadapt.tech/in-app-advertising-and-skadnetwork-ffb871d231d8 (last visited June 23, 2026).
[13] StackAdapt, *Retail Industry Advertising Solutions*, https://www.stackadapt.com/industry-solutions/retail (last visited June 23, 2026).
[14] BrainCheck, Inc., *Cookie Policy*, https://braincheck.com/cookie-policy/ (last visited June 23, 2026).

device" (such as computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser and Microsoft's Edge browser).

69. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

70. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[15]

71. A patient's HTTP Request essentially asks Kettering's Website to retrieve certain information, and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen

[15] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

as they navigate the Website).

72. Every website consists of Markup and “Client-Side Code.”

73. Client-Side Code is a set of instructions that commands the website visitor’s browser to take certain actions when the web page first loads or when a specified event triggers the code.

74. Client-Side Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser’s user.

75. Defendant’s Tracking Tools consist of embedded third-party JavaScript that does just that. A Tracking Tool acts much like a traditional wiretap by surreptitiously transmitting a Website User’s communications and inputs to third parties.

76. When patients visit Defendant’s Website via an HTTP Request to Kettering’s server, Defendant’s server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Client-Side Code (including Kettering’s Tracking Tools).

77. Thus, Kettering is, in essence, handing patients a wire-tapped device and once the webpage is loaded into the patient’s browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the Tracking Tools, which intercept those communications — intended only for Kettering — and transmits those communications to third-parties, including but not limited to Google.

78. Third parties, like Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the patient associated with the personal information intercepted (in this case, highly sensitive Private Information).

79. The third parties to whom a website transmits data through Tracking Tools are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.*, to bolster profits).

80. Thus, without any knowledge, authorization, or action by a user, a website owner like Kettering can use its Tracking Tools to commandeer a User's computing device, causing the device to contemporaneously and invisibly redirect the Users' communications to third parties.

81. In this case, Kettering employed the Tracking Tools to intercept, duplicate and redirect Plaintiff's and Class Members' Private Information to third parties.

82. Anyone who visits Kettering's Website is presented with a search bar and buttons that provide the following options: "Find Care Now", "Find a Doctor", and "Find a Location". Following that, patients can click to view a doctor's profile, which includes information about that doctor and patient reviews. From that page, patients can click to call for an appointment.

83. For example, as shown in Figure 1 below, if a patient clicks "Find a Doctor," and searches for "cancer" from the "Provider Name, Specialty, or Location" search bar, they will receive a list of links to featured pages and related providers, among other links. From here, a patient can click on a relevant provider's page, call the provider, or log in to MyChart to schedule an appointment. At every stage, Tracking Tools implemented in the Defendant's source code automatically tracks and transmits Users' communications, contemporaneously and without the Users' knowledge.




***Figure 1: Search results for "cancer" in the "Provider Name, Specialty, or Location" search bar***

84. Figure 2 depicts the tracking activity that occurs when a user searches for "cancer" using the "Provider Name, Specialty, or Location" search feature shown in Figure 1. At that time, Tracking Tools embedded in Defendant's source code record and transmit information reflecting the user's search term and interaction with the search function, along with associated unique

identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| cid | 559678659.1777649203 |
| frm | 0 |
| pscdl | noapi |
| rcb | 2 |
| sr | 1440x900 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;149.0.7827.55\|Chromium;149.0.7827.55\|Not)A%3BBrand;24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 14.8.3 |
| uaw | 0 |
| ul | en-us |
| _s | 2 |
| tag_exp | 0~115616985~115938465~115938469~117776793 |
| dl | https://ketteringhealth.org/doctors/?_p_search=cancer&_affiliation=khmg |
| dr | https://ketteringhealth.org/doctors/ |
| sid | 1781200900 |
| sct | 5 |
| seg | 1 |
| dt | Find a Provider \| Kettering Health |
| en | page_view |

***Figure 2: Tracker contemporaneously transmits contents of "cancer" search to Google.***

85. Figure 3 shows the user-facing webpage that appears after a user selects a physician from the search results, displaying the physician's profile, biography, and options to contact the provider.




***Figure 3. User view after clicking on Dr. Riggs from "cancer" "Provider Name, Specialty, or Location" search results.***

86. Figure 4 depicts the tracking activity that occurs when the physician profile shown in Figure 3 loads. At that time, Tracking Tools embedded in Defendant's Website automatically transmit information about the specific page viewed and the user's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| rcb | 17 |
| frm | 0 |
| auid | 1164236043.1777649200 |
| dt | McKayla Riggs, MD \| Kettering Health |
| en | page_view |
| dr | ketteringhealth.org |
| dl | https://ketteringhealth.org/doctors/mckayla-riggs-1942690060/ |
| scrsrc | www.googletagmanager.com |
| rnd | 396236898.1781201807 |
| navt | n |
| npa | 0 |
| gtm | 45be66a0v888397392z8842212170za20gzb842212170zd842212170xec |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 0~115938465~115938469 |
| apve | 1 |
| apvf | f |
| apvc | 0 |
| tids | AW-350592807 |
| tid | AW-350592807 |
| tft | 1781201808341 |
| tfd | 7140 |

***Figure 4. Tracker contemporaneously transmits user's action — Clicking on Dr. Riggs — to Google.***

87. From the profile page depicted in Figure 3, if a patient clicks on the "Schedule Now," button located on the top banner, Defendant's Website prompts the user to select the type of appointment and care for which they are seeking to make an appointment. Meanwhile, the Tracking Tools embedded in Defendant's Website automatically transmit unique identifiers and information reflecting the patient clicked a "Schedule Now" button from the specific doctor's profile page, the date and time of the click and other event data, to Google for analytics and advertising purposes. This disclosure is depicted in Figures 5 below.

| | |
|---|---|
| tag_exp | 115938465~115938469~119456239~119456247 |
| sid | 1781200900 |
| sct | 5 |
| seg | 1 |
| dl | https://ketteringhealth.org/find-care/ |
| dr | https://ketteringhealth.org/doctors/mckayla-riggs-1942690060/ |
| dt | Find Care \| Kettering Health |
| _tu | CA |
| en | My Chart Appt Click |
| _c | 1 |
| ep.content_group | Site |
| ep.post_category | |
| ep.post_tags | |
| ep.post_condition | |
| ep.post_date | 2026-06-02T11:38:51-04:00 |
| epn.post_year | 2026 |
| epn.post_month | 6 |
| ep.mychart_click_url | https://mychart.ketteringhealth.org/mychartprd/openscheduling/standalone?linksource=website&vt=1003&dept=101304006,108327001,108245001,108372001,108533001,108434001,108435001,108484001,108382001,108490001,108530001,108605001,108239001,108503001,108198001,108001001,108024001,108370001,108271001,108555001,108316001,108613001,108666001,108428001,108523001,108315001,108086001,108087001,108399001,108012001,108244001,108052001,108452001,108017003,108017004,108444001,108005001,108514001,108021001,108668001,108369001,108050001,108374001,101314001,101307001,101306001,101607001,108607001,108432001 |
| _et | 4036 |
| tfd | 139213 |

***Figure 5: Tracking Tools transmit the User's appointment-scheduling activity to Google.***

88. Alternatively, if the User clicks the Dr. Riggs's phone number from the profile page on Figure 3, the Tracking Tools embedded in Defendant's Website automatically transmit to Google, for analytics and advertising purposes, unique identifiers and information showing that

the patient clicked to call Dr. Riggs from his specific profile page, along with the date, time, and related event data. This disclosure is depicted in Figures 6 below.

| | |
|---|---|
| ul | en-us |
| _s | 2 |
| tag_exp | 115938465~115938469~119456239~119456247 |
| sid | 1781200900 |
| sct | 5 |
| seg | 1 |
| dl | https://ketteringhealth.org/doctors/mckayla-riggs-1942690060/ |
| dr | https://ketteringhealth.org/doctors/?_p_search=cancer&_affiliation=khmg |
| dt | McKayla Riggs, MD \| Kettering Health |
| en | phone_call_click |
| ep.content_group | Site |
| ep.post_category | |
| ep.post_tags | |
| ep.post_condition | Acquired Hemophagocytic Lymphohistiocytosis (HLH)\|Actinic Keratosis\|Anemias\|Ataxia Telangiectasia (A-T)\|Bleeding / Clotting Disorders\|Blood Disorders\|Bone Cancers\|Breast Cancer\|Cancer\|Cervical Cancer\|Chondrosarcoma\|Choroid Plexus Papilloma\|Colon Cancer\|Enchondroma\|Glioblastoma Multiforme\|Gliomas\|Gynecologic Cancer\|Heart Attack\|Lung Cancer\|Lymphoma, Cutaneous T-Cell\|Lymphomas\|Medulloblastoma\|Multiple Myeloma\|Osteosarcoma\|Pineal Body Tumor\|Pineal Gland Tumor\|Polycythemia Vera\|Prostate Cancer\|Sickle Cell Disease\|Thalassemias\|Thrombosis |
| ep.post_date | 2025-12-15T22:06:00-05:00 |
| epn.post_year | 2025 |
| epn.post_month | 12 |
| ep.phone_number | tel:18555002873 |
| _et | 1079 |
| tfd | 103940 |

***Figure 6: Tracking Tools transmit the User's click-to-call activity to Google.***

89. Kettering's Tracking Tools intercept and disclose to Google and other third parties both the "contents" of individuals' communications on Kettering's Website (*i.e.*, the URLs, buttons, links, pages, and tabs they view, and the information entered into the Website's forms)

and identifiers that can uniquely identify the patient (*i.e.*, the individuals' IP addresses, cookie identifiers, device identifiers and account numbers).

90. Once a patient chooses a doctor, all of the information that patient has submitted is automatically sent directly to third parties, including but not limited to Google. The information transmitted to third parties includes, (i) the patient's search parameters, (ii) the fact that the patient clicked on a specific provider's profile page, (iii) whether the patient called that provider; (iv) whether the patient logged into MyChart to schedule an appointment; and several categories of identifiers that can uniquely identify the patient.

91. Each time Kettering sends this activity data, it also discloses a patient's personally identifiable information alongside the contents of their communications.

92. Thus, Defendant reveals to Google and other third parties the exact links and pages website users click and view and discloses extensive insight into the user's past, present, and/or future health care, which qualifies as protected health information under HIPAA. *See* 45 C.F.R. § 160.103.

93. This example highlights just one of the hundreds (if not thousands) of paths on Kettering's Website demonstrating how Defendant's Website surreptitiously collects and transmits protected health information to its third-party vendors.

94. The disclosures described above are taking place without Users' consent.

95. Thus, without the consent of visitors to its Website, Defendant has effectively used its source code to commandeer Users' computing devices thereby re-directing their Private Information to third parties.

96. The information Defendant's Tracking Tools send to Google and other third parties may include, among other things, Users' PII, PHI and other confidential information.

97. Consequently, when Plaintiff and Class Members visit Kettering's Website and communicate their Private Information, it is transmitted to Google, and other third parties, including, but not limited to: (i) medical conditions and specialties searched by Users; (ii) the names and profiles of healthcare providers viewed by Users; (iii) facility locations selected or searched by Users; (iv) the content of Users' free-text searches conducted via the Website's search bar; (v) the full-string URLs of pages visited by Users, which encode and reflect the substance of Users' healthcare-related browsing activity; (vi) when Users click a provider's phone number to call for an appointment, or clicks to schedule an appointment which are captured and transmitted as discrete tracked events; (vii) when Users click to pay a bill, and view or request medical record(s); (viii) Users' personal identifiers transmitted contemporaneously with the foregoing, including IP addresses and unique cookie identifiers associated with each third-parties' own Tracking Tools. The URLs transmitted to third parties further reflect when Users navigate to pages associated with scheduling appointments, contacting providers, or accessing the patient portal.

**F. Unique Personal Identifiers, including IP Addresses, are Protected Health Information.**

98. While not all entities are covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[16]

99. The HIPAA Privacy Rule sets forth policies to protect all individually identifiable health information that is held or transmitted.

100. HIPAA identifies at least 18 categories of identifiers that render health information

[16] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations[.]").

individually identifiable when maintained by or disclosed from a covered entity. Such identifiers constitute protected health information when they identify an individual or when the covered entity has actual knowledge that the information can be used alone or in combination with other information to identify an individual. *See* 45 C.F.R. § 164.514(b)(2)(i).

101. These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[17]

102. Kettering unlawfully disclosed Plaintiff's and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited to third parties through their use of the Tracking Tools *in addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

103. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

104. In addition to patient status, medical conditions, treatment, specific providers, and appointment information, Kettering improperly disclosed patients' computer IP addresses to third parties like Google through the use of Tracking Tools.

105. An IP address is a number that identifies the address of a device connected to the Internet.

106. IP addresses are used to identify and route communications on the Internet.

[17] U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited June 23, 2026).

107. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

108. Under HIPAA, an IP address is considered personally identifiable information.

109. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. See 45 C.F.R. § 164.514 (2).

110. Consequently, Kettering's disclosure of patients' IP addresses violated HIPAA and industry-wide privacy standards.

111. In addition to the substantive health-related information described above, Kettering disclosed to Google and other third parties a series of unique identifying codes associated with Plaintiff's and Class Members' website interactions, including persistent cookie identifiers, device identifiers, and other tracking IDs assigned by third-party Tracking Tools.

112. These unique identifying codes include, among others, Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, and the StackAdapt tracking identifier, sa-user-id, which all function as persistent identifiers that allow these third party vendors to distinguish, recognize, and track a specific individual or device across browsing sessions and across websites.

113. Under HIPAA, "individually identifiable health information" expressly includes not only traditional identifiers like names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can be used to identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b)(2)(i).

114. HIPAA's de-identification rule makes clear that information is not de-identified if

it includes device identifiers, IP addresses, URLs, or other unique identifying codes, or if the covered entity has actual knowledge that the information could be used—alone or in combination with other information—to identify an individual. 45 C.F.R. § 164.514(b)(2).

115. Kettering knowingly disclosed these unique identifying codes alongside URLs, page content, button clicks, search terms, and other communications that directly reflect an individual's interest in, pursuit of, or receipt of healthcare services, thereby allowing third parties to link those health-related communications to a specific, identifiable patient.

116. Because these unique identifying codes were transmitted together with information relating to an individual's health conditions, providers, appointments, or treatment inquiries, they constitute individually identifiable health information—and therefore protected health information—under HIPAA.

117. Kettering's disclosure of these unique identifying codes to third parties was not incidental, anonymous, or de-identified, but instead enabled ongoing recognition, profiling, and re-identification of Plaintiff and Class Members in connection with their healthcare activities, in direct contravention of HIPAA's privacy and de-identification requirements.

## G. Defendant's Privacy Policy and Promises.

118. During the statutory period, Kettering's Notice of Privacy Practices (the "Notice") represented that it never shares or discloses users' health information for marketing purposes or for the sale of users' information without first obtaining the users' written authorization.[18] Yet, the Notice does not disclose that health-related data is nonetheless shared with third-party advertising and analytics providers, creating a clear inconsistency between what the policy states and what occurs in practice.

[18] *See* Kettering, Notice of Privacy Practices, https://ketteringhealth.org/patients-visitors/policies-legal-disclaimers/privacy-policy/ (last visited June 25, 2026).

119. Defendant's Privacy Policy disclosures further represent that information shared for advertising purposes is limited in scope and does not include identifying or health information. Specifically, Defendant states: "We will use and disclose your personal health information as necessary, and as permitted by law[…] We are required by law to maintain the privacy of our patients' personal health information and to provide patients with notice of our legal duties and privacy practices with respect to your personal health information. We are required to abide by the terms of this notice so long as it remains in effect."[19]

120. The Privacy Policy also assures users that, "[i]n the unlikely event that there is [] [an] unauthorized release of your personal health information, you will receive notice and information on steps you may take to protect yourself from harm." [20]

121. Further, in its Website Privacy Policy, Defendant claims that it "may [] use personal information to create aggregate or de-identified data that is not personally identifiable for any legally permissible purposes []."[21]

122. Finally, Defendant contends that it is "committed to the security of personal information. We take appropriate security measures to limit abuse of and unauthorized access to personal information. This ensures that only the necessary persons have access to your information, that access to the information is protected, and that our security measures are regularly reviewed."[22]

123. These statements are materially misleading in light of Defendant's actual website

---

[19] *Id.*

[20] *Id.*

[21] *See* Kettering, Website Privacy Policy, https://ketteringhealth.org/patients-visitors/policies-legal-disclaimers/website-privacy-policy/ (emphasis added).

[22] *Id.*

practices. As set forth herein, Defendant's websites deploy third-party tracking technologies that intercept users' interactions with the website, including pages visited, search parameters, and communications entered into website forms. Those interactions are transmitted together with persistent identifiers such as IP addresses, cookies, and device identifiers to third-party analytics and advertising platforms including, but not limited to, Google.

124. Defendant's privacy disclosures do not adequately inform patients that their interactions with healthcare provider pages, appointment scheduling tools, or other health-related webpages may be transmitted to third-party advertising and analytics companies through tracking technologies embedded on the website. A reasonable user reviewing Defendant's policies would understand that health-related information is not shared with advertising partners and that any marketing-related disclosures are limited to basic technical identifiers.

125. By intercepting and transmitting Plaintiff's and Class Members' interactions together with unique identifiers to third-parties, Defendant disclosed information beyond what its privacy disclosures represented. These transmissions occurred without obtaining the written authorization or informed consent that Defendant's own privacy materials represent is required for marketing uses or disclosures of their Private Information.

**H. Federal Warning on Tracking Codes on Healthcare Websites.**

126. Beyond Defendant's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by the Defendant may come up against federal privacy law when installed on healthcare websites.

127. The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Defendant's Tracking Tools, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in

a way that may expose patients' protected health information to these vendors.[23]

128. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[24]

129. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[25]

130. Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendant has passed along Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining

---

[23] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[24] *Id.* (emphasis added).

[25] *Id.* (emphasis added).

healthcare for certain conditions and where they seek medical treatment.

131. This information is, as described by the OCR Bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, ***or any unique identifying code.***[26]

132. Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services… [for example,] if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, ***the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.***[27]

133. The OCR Bulletin reminds healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as the Google Tracking Tools, only in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.28

134. The federal government is taking these violations of health data privacy and

[26] *Id.* (emphasis added).

[27] *Id.* (emphasis added).

[28] *See id.*

security seriously, as recent high-profile FTC settlements against several telehealth companies demonstrate.

135. For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[29]

136. Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google

[29] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.); (last visited June 23, 2026).

Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[30]

137. This is further evidence that the data that Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiff's and Class Members' rights.

**I. Kettering's Use of Tracking Technologies Violated HIPAA.**

138. Kettering's disclosure of Plaintiff's and Class Members' Private Information to entities like Google also violated HIPAA.

139. Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[31]

140. HHS instructs healthcare providers that patient status itself is protected by HIPAA.

141. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;"

---

[30] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.

[31] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

142. The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

143. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> …
>
> H. Medical record numbers;
>
> …
>
> J. Account numbers;
>
> …
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the

information."[32]

144. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers like Defendant—to maintain appropriate safeguards to protect the privacy of PHI. The Privacy Rule also sets limits and conditions on the uses and disclosures of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

145. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

146. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[33]

147. Consistent with this restriction, HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the

---

[32] *See* 45 C.F.R. § 160.514.

[33] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited June 23, 2026).

list."[34]

148. Here, as described *supra*, Kettering provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320(d)(6).

149. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

150. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

151. HIPAA also requires Kettering to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Kettering failed to do.

[34] *Marketing*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited June 23, 2026).

152. Under HIPAA, Kettering is forbidden to disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

153. Kettering further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Kettering created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Kettering in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

154. In disclosing the content of Plaintiff's and the Class Members' communications, Kettering had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

155. Kettering's placement of third-party Tracking Tools on its Website is a violation of

Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Kettering's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**J. Defendant Violated Industry Standards.**

156. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

157. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

158. AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care…. Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

159. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

160. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in

keeping ethics guidelines for confidentiality.[35]

**K. Users' Reasonable Expectation of Privacy.**

161. Plaintiff and Class Members were aware of Kettering's duty and assurances of confidentiality when they sought medical services from Defendant.

162. Indeed, when Plaintiff and Class Members provided their PII/PHI to Kettering, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

163. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

164. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[36]

165. Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

166. Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Kettering's status as a healthcare provider, Defendant's

---

[35] Am. Med. Ass'n, *Code of Medical Ethics ch. 3*, https://policysearch.ama-assn.org/policyfinder/detail/data%20integrity?uri=%2FAMADoc%2FEthics.xml-E-3.3.2.xml (last visited June 23, 2026).

[36] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express promises of confidentiality.

**L. Plaintiff's and Class Members' Private Information Has Substantial Financial Value.**

167. Plaintiff and Class Members' Private Information has substantial value. Kettering's disclosure and interception harmed Plaintiff and the Class Members by not compensating them for the value of their Private Information and diminishing the value of their Private Information

168. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

169. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

170. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, the damage caused can be irreparable.

171. The value of health data is well-known, and various reports have been conducted to identify its value.

172. Specifically, in 2023, the Value Examiner published a report titled "Valuing Healthcare Data." The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such

data should ensure it is priced at fair market value to mitigate any regulatory risk."[37]

173. Trustwave Global Security published a report entitled "The Value of Data." With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next-highest-value record (a payment card).[38]

174. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[39]

175. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[40]

176. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

177. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

---

[37] *See Valuing Healthcare Data* (white paper), Health Capital (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

[38] *See Healthcare Data: The New Prize for Hackers*, Imprivata (Nov. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[39] *See* Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

[40] *See* Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

178. Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[41] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

179. Data harvesting is the fastest growing industry in the nation.

180. As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

181. Consumer data is so valuable that some have proclaimed that data is the new oil.

182. Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

183. Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

184. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per adult American user each year, making personal data sales a nearly $140 million industry.[42]

185. In 2025, the global big data market was projected to be valued at approximately $224.46 billion.[43]

186. As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage

[41] *Lookalike audiences*, Display & Video 360 Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited May 12, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list … find other potential customers with similar characteristics").

[42] Pawtocol, *How Much Is User Data Worth?*, Medium (Mar. 16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136.

[43] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

> industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are becoming commonplace).[44]

187. Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[45]

188. The CNBC article also explained:

> De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider

---

[44] *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records.

[45] *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

> organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

189. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[46]

190. Time Magazine similarly, in an article titled, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[47]

191. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[48]

---

[46] *Id.*

[47] *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

[48] *See 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited June 23, 2026).

192. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

193. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

194. Kettering gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

195. The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

196. Plaintiff has a continuing interest in ensuring that her future communications with Kettering are protected and safeguarded from future unauthorized disclosure.

## M. Defendant was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.

197. Kettering intentionally deployed and configured the Tracking Tools on its Website to disclose its patients' Private Information to third parties for marketing, commercial advantage, and profit, a benefit Kettering could obtain only through the knowing disclosure of that Private Information.

198. In exchange for disclosing the Personal Information of its patients, Kettering is compensated by third party vendors like Google in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

199. After receiving individually identifiable patient health information communicated on the Kettering Website, third party vendors forward this data, and its analysis of this data, to Defendant.

200. Kettering then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

201. Kettering also receives an additional commercial benefit from using third party Tracking Tools, such as the Google DoubleClick, namely being able to serve more targeted advertisements to existing and prospective patients on their Google accounts.

202. Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services … your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[49]

203. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[50]

204. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a healthcare website back to Google via the Tracking Technologies and the tag embedded on, in this case, Kettering's Website. For example, when a User searches for doctors, medical conditions or treatment on Kettering's Website, that

---

[49] *How Google uses information from sites or apps that use our services*, Privacy & Terms, *https://policies.google.com/technologies/partner-sites* (last visited June 23, 2026).

[50] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited June 23, 2026).

information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on a Kettering ad and ensure that those users targeted are more likely to convert.[51]

205. Through this process, the Google Tracking Tools embedded on Kettering's Website record and transmit information about a User's activity when the User loads and interacts with the Website. As Google explains, when a User completes or triggers a defined action on a website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[52]

206. Plaintiff's and Class Members' Private Information have considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

207. As alleged above, Kettering's use of Tracking Tools was not incidental or merely technical. Kettering intentionally caused Plaintiff's and Class Members' Website communications to be disclosed to Google and other third parties, obtained commercial benefits from those disclosures, and diminished the value and confidentiality of the Private Information disclosed. The following allegations describe how Plaintiff personally used Kettering's Website and how her Private Information was intercepted and disclosed through that same tracking process.

---

[51] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies and then serve targeted Google Ads to those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited June 23, 2026).

[52] *Id*.

## REPRESENTATIVE PLAINTIFF MARANDA MOREFIELD'S EXPERIENCES

208. As a condition of receiving Kettering's services, Plaintiff Maranda Morefield disclosed Private Information to Kettering on numerous occasions, most recently in March 2026.

209. Ms. Morefield accessed Kettering's Website on her computer, phone, and tablet to receive healthcare services from Defendant and at Defendant's direction.

210. During the relevant time period, when the Defendant's Tracking Tools were present, Ms. Morefield used Kettering's website, www.ketteringhealth.org, to schedule appointments, research providers and login to MyChart. The full scope of Kettering's interceptions and disclosures of Ms. Morefield's communications to third parties, including but not limited to Google, can only be determined through formal discovery. However, Kettering intercepted and transmitted to third parties via Tracking Tools at least the long-URLs or substantially similar URL communications about Ms. Morefield's prospective healthcare identified in Exhibit A.[53]

211. Contemporaneously with its interception and transmission of Ms. Morefield's communications on www.ketteringhealth.org, Kettering also disclosed to third parties Ms. Morefield's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account identifiers.

212. Kettering never notified Ms. Morefield that it and third parties would put individually identifiable patient health information about her past, present, or future health conditions to their own commercial uses. Ms. Morefield never provided informed consent or written permission allowing Kettering to send individually identifiable patient health information about her past, present, or future health conditions to third parties. Ms. Morefield never provided

[53] Exhibit A contains Plaintiff's protected health information which is confidential and may not be publicly disclosed. Following the Court's entry of a protective order, which Plaintiff will move for immediately following the filing of the instant complaint, Plaintiff will file Exhibit A under seal.

informed consent or written permission allowing Kettering or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

213. After using Kettering's Website and communicating her Private Information, Plaintiff received advertisements for Kettering's services on Facebook and advertisements related to specific medical conditions on Google. Plaintiff did not consent to Kettering's use or disclosure of her Private Information for advertising or marketing purpose.

214. Google maintains records of the advertisements it serves to individual users and their devices. Ms. Morefield will seek in discovery the records reflecting the ads related to her medical conditions and treatments that were delivered to her and the Class Members, along with associated targeting and delivery data, to fully inform the scope of their claims and damages and the ways in which their Private Information was used for advertising.

215. Ms. Morefield provided Private Information to Kettering and trusted that the information would be safeguarded according to Kettering's policies and state and federal law.

216. Ms. Morefield reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Kettering, and that such communications would not be transmitted to or intercepted by a third party.

217. By doing so without her consent, Kettering breached its Notice of Privacy Practices and Privacy Policy and unlawfully disclosed Ms. Morefield's Private Information.

218. Plaintiff Morefield suffered damages in form of (i) invasion of privacy; (ii) loss of control over her Sensitive Financial Information; (iii) statutory damages under the ECPA; and (iv) AmeriSave's unjust retention of benefits obtained from its unauthorized use and disclosure of her Sensitive Financial Information.

219. Plaintiff Morefield has a continuing interest in ensuring that her Private Information, which remains in Kettering's possession, is protected and safeguarded from future unauthorized disclosure.

**TOLLING**

220. Any statute of limitations applicable to Plaintiff's claims have been tolled by Kettering's actual knowledge and efforts to conceal the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and the Class Members had no obvious way to discover Kettering's deception and unlawful conduct.

221. Plaintiff and the Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Kettering was acting unlawfully. The earliest Plaintiff or a reasonable user of Kettering's Website could have learned of Kettering's conduct was approximately April 2026, when Plaintiff's counsel, through an independent technical investigation, identified Tracking Tools operating on Kettering's Website and transmitting user healthcare communications and identifiers to third parties. Kettering's alleged representations were material to Plaintiff and the Class Members at all relevant times. Before the expiration of any applicable statute of limitations period, Plaintiff and the Class Members could not have discovered Defendant's wrongful conduct through the exercise of reasonable diligence because Kettering's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Kettering's Website, and Defendant made no disclosures or other indications that would inform a reasonable user of its Website that Kettering intercepting and disclosing Users' individually-identifiable health information to third parties.

222. At all relevant times, Kettering was—and still is—under a continuous duty to disclose to Plaintiff and the Class Members the true nature of the disclosures being made and the

lack of an actual "requirement" before it shares Plaintiff's and the Class Members' data with third parties, including but not limited to, Google.

223. Kettering knowingly, actively, affirmatively or negligently concealed the facts alleged herein.

224. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Ohio's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

225. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

226. The Class that Plaintiff seeks to represent is defined as follows:

> All people who used Kettering's Website and who had their Private Information disclosed or transmitted to Google or any other unauthorized third party.

227. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries; any entity in which Defendant has a controlling interest; any Defendant officer or director, any successor or assign; Defendant's and Plaintiff's attorneys in this action, their staff and immediate family; and any Judge who adjudicates this case, including their staff and immediate family.

228. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

229. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class Members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that the business records of Kettering andGoogle will permit the identification of thousands of people meeting the Class definition.

230. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class Members, including:

a. Whether Kettering had a duty to protect and refrain from disclosing the Class Members' individually identifiable health information;

b. Whether Kettering intentionally disclosed the Class Members' individually identifiable health information to third parties including but not limited to Google;

c. Whether the Class Members consented to Kettering's disclosure of their individually identifiable health information to third parties, including but not limited to Google;

d. Whether the Class Members are entitled to damages because of Kettering's conduct; and

e. Whether Kettering's knowing disclosure of its patients' individually identifiable health information to third parties, including but not limited to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

231. Plaintiff also anticipates that Defendant will raise defenses common to the Class.

232. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class Members. Plaintiff and the Class Members were harmed by the same wrongful conduct perpetrated by Kettering that caused their individually identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class Members' claims.

233. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiff will fairly and adequately protect the interests of all the Class Members, there are no known conflicts of interest between Plaintiff and the Class Members, and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

234. Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class Members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class Members' ability to protect their interests.

235. The State of Ohio has a significant interest in regulating the conduct of businesses operating within its borders.

236. Ohio, which seeks to protect the rights and interests of Ohio and all residents and citizens of the United States against a company headquartered and doing business in Ohio, has a greater interest in the claims of Plaintiff and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

237. The principal place of business and headquarters of Kettering, located in Ohio, is the "nerve center" of its business activities—the place where its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

238. Kettering's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Ohio.

239. Kettering's breaches of duty to Plaintiff and Class Members emanated from Ohio.

240. Application of Ohio law to the Class with respect to Plaintiff's and the Class Members' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of Ohio applies to the nationwide common law claims of all Class Members. Additionally, given Ohio's significant

interest in regulating the conduct of businesses operating within its borders, and that Ohio has the most significant relationship to Kettering, as it is headquartered in Ohio, there is no conflict in applying Ohio law to non-resident consumers such as Plaintiff and Class Members. Alternatively, and/or in addition to Ohio law, the laws set forth below apply to the conduct described herein.

## COUNT I
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2510, *et seq.*

241. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

242. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

243. The ECPA protects both the sending and receipt of communications.

244. The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

245. Kettering intentionally intercepted electronic communications that Plaintiff and the Class Members exchanged with Defendant through Tracking Tools installed on Kettering's Website.

246. The transmissions of data between Plaintiff and the Class Members and Kettering qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

247. Kettering contemporaneously intercepted and transmitted Plaintiff's and the Class Members' communications to third parties, including but not limited to Google.

248. The intercepted communications include:

a. The content of Plaintiff's and the Class Members' communications relating to appointments with medical providers;

b. The content of Plaintiff's and the Class Members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

c. Button/menu selections and/or content typed into free text boxes; and

d. Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

249. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Kettering and third parties, including but not limited to, Google, use to track Plaintiff's and the Class Members' communications;

b. Plaintiff's and the Class Members' browsers;

c. Plaintiff's and the Class Members' computing devices, including desktop computers, laptop computers, tablets and smartphones;

d. Kettering's web-servers or webpages where Tracking Tools are present;

e. Google and StackAdapt's web-servers; and

f. The third-party analytics scripts embedded in Kettering's Website, which intercept and transmit Plaintiff's and the Class Members' communications to third parties.

250. Google and other third parties are not parties to Plaintiff's and the Class Members' communications with Kettering.

251. Kettering transmits the content of Plaintiff's and the Class Members' communications to third parties, including but not limited to, Google through the surreptitious redirection of those communications from Plaintiff's and the Class Members' computing devices.

252. Plaintiff and the Class Members did not consent to third parties' acquisition of their appointment and treatment communications with Kettering.

253. Third parties like Google did not obtain legal authorization to obtain Plaintiff's and the Class Members' communications with Kettering relating to communications with their health entities.

254. Google did not require Kettering to obtain the lawful rights to share the content of Plaintiff's and the Class Members' communications relating to appointments and treatments.

255. Any purported consent that Google received from Kettering to obtain the content of Plaintiff's and the Class Members' communications was not valid.

256. In disclosing the content of Plaintiff's and the Class Members' communications relating to treatments, conditions and appointments, Kettering had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions, as follows:

a. The unauthorized disclosure of individually identifiable health information is tortuous in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use for the acquisition. Kettering intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so.

b. The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6, regardless of any subsequent purpose or use of the individually identifiable health information. Kettering intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

c. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, is a crime punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Kettering intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

d. Breach of confidence; and

e. Trespass upon Plaintiff's and the Class Members' personal and private property via the placement of the Tracking Tools on Plaintiff's and the Class Members' personal computing devices is tortious.

257. Kettering's intent to disclose Plaintiff's and Class Members' Private Information to Google and other third parties existed before each interception because Kettering affirmatively chose to deploy, configure, and maintain Tracking Tools on its Website that were designed to capture and transmit patient communications for Kettering's marketing, commercial advantage, and profit.

258. To the extent Kettering contends it was a party to the communications at issue, the party exception in 18 U.S.C. § 2511(2)(d) does not bar liability because Kettering intercepted Plaintiff's and Class Members' communications for the purpose of committing criminal and tortious acts, including knowingly disclosing individually identifiable health information to third parties in violation of 42 U.S.C. § 1320d-6(a)(3), and doing so for commercial advantage and personal gain.

259. Plaintiff's and Class Members' information that Kettering disclosed to third parties qualifies as individually identifiable health information, and Defendant violated Plaintiff's expectations of privacy, which constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Kettering intentionally used the wire or electronic communications to increase its profit margins. Kettering specifically used the Tracking Tools and other codes to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

260. Plaintiff and Class Members did not authorize Kettering to acquire the contents of their communications through Tracking Tools or to use those communications to invade their privacy. Plaintiff and Class Members reasonably expected that Kettering would not redirect the

contents of their communications, together with personal identifiers, to third parties without their knowledge or consent.

261. Any purported consent that Kettering received from Plaintiff and Class Members was not valid.

262. Kettering's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its privacy policies set forth above.

263. Kettering acted with the intent to defraud in that it willfully invaded Plaintiff's and the Class Members' property rights, including their:

a. Property right to the confidentiality of their Private Information, their right to determine whether such information remains confidential and their exclusive right to determine who may collect and/or use such information for marketing purposes; and

b. Property right to determine who has access to their computing devices.

264. Kettering acted with the intent to defraud in that it willfully invaded and took Plaintiff's and the Class Members' property:

a. With knowledge that (1) Kettering did not have the right to share Private Information without written authorization; (2) courts have determined that a healthcare providers' use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not understand that Google and other third party vendors were collecting their Private Information based on their activities on Kettering's Website; and (4) the subsequent use of health information for advertising was a further invasion of Plaintiff's and Class Members property rights to make exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare.

b. With the intent to (1) acquire Plaintiff's and the Class Members' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use

Plaintiff's and the Class Members' individually-identifiable health information without their authorization.

265. Plaintiff and the Class Members have suffered damages because of Kettering's violations of the ECPA that include:

a. Kettering eroded the essential, confidential nature of the provider-patient relationship;

b. Kettering failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

c. Kettering derived valuable benefits from using and sharing the contents of Plaintiff's and the Class Members' communications on its Website without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

d. Kettering's actions deprived Plaintiff and the Class Members of the value of their individually identifiable health information;

e. Kettering's actions diminished the value of Plaintiff's and the Class Members' property rights in their individually identifiable health information; and

f. violating Plaintiff's and the Class Members' privacy rights by sharing their individually identifiable health information for commercial use.

266. For Kettering's violations set forth above, Plaintiff and the Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Kettering] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

267. Unless enjoined, Kettering may continue to commit the violations of law alleged here.

268. Plaintiff wants to continue to communicate with her healthcare providers through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Google and other third parties and thus continues to be at risk of harm from Defendant's conduct.

269. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class Members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by the Plaintiff and any profits made by Kettering as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**COUNT II**
**UNJUST ENRICHMENT**

270. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

271. Defendant Kettering benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

272. Plaintiff and Class Members conferred a benefit upon Defendant Kettering in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible and other benefits, including substantial monetary compensation.

273. That is, in exchange for disclosing the PII of its patients, Defendant is compensated by Google and other third-parties in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms. By utilizing the third-party Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

274. Plaintiff and the Class Members provided their Private Information to Kettering in reliance on Kettering's privacy representations that it would not disclose their health information or personally identifiable information to third parties for marketing or other unauthorized purposes. Plaintiff and Class Members did not intend to confer the advertising, analytics, retargeting, or other commercial benefits that Kettering obtained through the unauthorized disclosure of their Private Information.

275. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

276. The benefits that Defendant Kettering derived from Plaintiff and Class Members were not offered by Plaintiff and Class Member gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Ohio for Defendant to be permitted to retain any of the revenue or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

277. Defendant Kettering should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Morefield, on behalf of herself and all those similarly situated, respectfully prays for judgment in her favor and against Defendant Kettering as follows:

- For an Order certifying this action as a class action and appointing Plaintiff Maranda Morefield as Class Representative and Plaintiff's counsel as Class Counsel;
- For equitable relief enjoining Kettering from engaging in the wrongful conduct complained of herein pertaining to the misuse

and/or disclosure of Plaintiff's and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and other Class Members;

- For equitable relief compelling Kettering to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;
- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Kettering's wrongful conduct;
- For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;
- For an award of punitive damages as allowable by law;
- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;
- Pre- and post-judgment interest on any amounts awarded; and
- All such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: June 26, 2026

Respectfully submitted,

s/ Drew Legando
Drew Legando (0084209)
**MERRIMAN LEGANDO & WILLIAMS, LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. drew@merrimanlegal.com

James B. Zouras (*pro hac vice forthcoming*)
Ryan F. Stephan (*pro hac vice forthcoming*)
Michael J. Casas (*pro hac vice forthcoming*)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550

312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com

*Attorneys for Plaintiff and the Putative Class*